(21 App. Div. 156.)

PEOPLE ex rel. GLEASON v. TOWN BOARD OF TOWN OF HEMPSTEAD.

(Supreme Court, Appellate Division, Second Department. October 12, 1897.)

GREATER NEW YORK—BOUNDARIES—SHIFTING CHANNEL.

By Laws 1894, c. 64, providing for submission of the question of consolidation to the vote of the people within the proposed territory of the Greater New York, that territory, so far as relating to the town of Hempstead, was described as west of an imaginary line drawn "through the middle" of a certain channel. This channel shifts its location westward about 1,000 feet a year. An official survey was made of the line as the channel

then existed, and a map made and filed. The vote upon the consolidation was taken on that basis. By Laws 1896, c. 488, declaring consolidation, and the new charter (Laws 1897, c. 378), that line was described in the same words as used in Laws 1894, c. 64, though the channel had meanwhile shifted some three-quarters of a mile. *Held,* that the several acts were to be considered as part of a continuous scheme, and that the later acts referred to the channel as it existed in 1894, as shown by the official map.

Appeal from special term.

Mandamus by the people, on the relation of Patrick J. Gleason, against the town board of the town of Hempstead. A peremptory writ was awarded, commanding defendant to reconvene, and divide the town into election districts, so that the districts would be, respectively, wholly within or wholly without the boundary of Greater New York in that town, and to make such division upon the boundary line shown upon a map filed in the town clerk's office in 1894. Defendant appealed. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

Townsend Scudder, for appellant.

F. B. Lord and Daniel Lord, for village of Lawrence, intervening with appellant.

F. H. Van Vechten, for respondent.

GOODRICH, P. J.   In order to determine this controversy, we must look at the whole scheme creating the new municipality of the city of New York, commonly known as the "Greater New York." In 1894 the legislature passed an act (chapter 64, Laws 1894) providing for a submission of the question of consolidation to the vote of the people within the territory proposed to be included within the Greater New York. The territory, so far as it relates to the town of Hempstead, is described in the act as follows:

"And that part of the town of Hempstead which is westerly of a straight line drawn from the southeasterly point of the town of Flushing, through the middle of the channel between Rockaway Beach and Shelter Island to the Atlantic Ocean."

This channel has for many years been shifting its location to the westward, apparently at the rate of 1,000 feet per year. Rockaway Beach and Shelter Island are long, narrow sand banks thrown up by the action of the ocean, and form the outer boundary of what is known as Far Rockaway Bay, to the north of which, on the mainland, lies the town of Hempstead. In order that the inspectors of election might know whether the voters resident in the election districts of Hempstead were or were not entitled to vote on the question, the county clerk of Queens county, under the authority of a resolution passed by the board of supervisors, had a survey made of a line passing through the channel as it existed at that time, and this map and survey were filed in the office of the town clerk. At the election of 1894 the voters residing to the west of the above-mentioned line voted upon the question of consolidation, and a majority of the voters within the entire territory of the Greater New York voted in favor of consolidation upon the line as above defined. In 1896 the legislature

passed another act (chapter 488 of the Laws of that year) declaring consolidation with the city of New York of the territory named in the act of 1894, using the defining language of that act, identically, so far as it relates to the town of Hempstead, and provided that this portion of the act should take effect upon January 1, 1898. The act further provided for a commission to draft by-laws and a proposed charter, and for the election of a mayor and other municipal officers at the general election of 1897. The charter reported by the commission was adopted by an act of the legislature in May, 1897 (chapter 378), the first section of which also defined the boundary of the new municipality in the town of Hempstead in the identical language of the acts of 1894 and 1896; and the act also provided that the consolidation should take effect on January 1, 1898. The same legislature, by chapter 381 of the Laws of 1897, required the town board of the town of Hempstead, on or before July 1, 1897, to divide the town into election districts. Having met for that purpose, the board was urged to regard as the boundary line of the Greater New York a line drawn from the southeast point of the town of Flushing through the middle of Rockaway channel as it existed at that time, which was about three-quarters of a mile westward of its position in 1894. The board refused to do this, and took the boundary line as it existed in 1894. On July 12th the board reconsidered its action, and adopted a resolution to regard as the boundary a line drawn through the channel of Rockaway inlet as it then existed. An order was made at special term directing that a mandamus issue, commanding the town board of Hempstead to reconvene and divide the town into election districts of such a character that the several districts should be either wholly within or wholly without the boundary line, and, in making such division, to regard the boundary line as fixed by the channel of Rockaway inlet as it existed in 1894. From this order the town authorities appeal.

The question therefore arises, which of two lines forms the boundary of the Greater New York at the present time? It has been the uniform policy of this state, since the act providing for the incorporation of villages (chapter 426, Laws 1847), to have the question of incorporation submitted to the voters of the locality; and that act provided for the taking of a census and the making of a survey, which were to be filed and made public records. This provision continued in force until 1897, when the revision act for the incorporation of villages was passed (chapter 414, Laws 1897). This act provided for the similar submission of the question of incorporation to the voters of the district. Thus, the general policy of the law has been that questions of this character should be submitted to the people of the localities affected. The act of 1894 providing for the submission of the question of consolidation to the voters of the districts affected, the act of 1896 providing for consolidation, and the charter act of 1897 must be considered as parts of a continuous scheme. The voters of the territory embraced within the boundary line as it existed in 1894 have been consulted, and by their votes at the election of 1894 have declared their desire for consolidation upon the lines laid down in the act of 1894. This declaration has been acted upon and confirmed by the

subsequent legislatures of 1896 and 1897, and we cannot resist the conclusion that it was the manifest purpose and intention of the legislatures of the latter two years to declare the boundary line of Greater New York, within the town of Hempstead, to be that which was submitted to the people of the entire metropolitan district in 1894. To hold otherwise would be in conflict with the general policy of the state in submitting questions of this character to the localities affected. It cannot be that the eastern line was to be shifted at various times in the course of the necessarily long legislation, in pursuit of a channel which had no local permanency. The intention of the legislature is what we are seeking to ascertain, and we find this in the initial act of the scheme. in 1894. As no change was made in any of the subsequent acts in the use of the language by which the boundary line was defined, we cannot assume that there was any change in the legislative mind with regard to the plan originally formulated; and we must believe that at the last, as at the first, the new municipal district was intended to be the same as that which was submitted to the vote of the people. It may be that the legislature may deem it wise to define the present boundary by exact metes and bounds; but, until it shall see fit to do so, we can do nothing more than interpret existing legislation in accordance with the manifest intention of the legislature and the vote of the people of the territory affected.

It follows that the order must be affirmed. All concur.